17-066-8 University of Chicago v. Workers' Compensation Comm'n Council, you may proceed. Please declare. Council, Mark Matranga for the University of Chicago. Before we commence, I have to apologize to the court. I noted in our reply brief in the second paragraph, we made reference to there being both elbow and shoulder MRI studies discussed at the time the claim presented to the U of C Occupational Medicine on June 27, 2001. That's indirect. The shoulder MRI was not performed until much later. So with my apology and that errata, I will proceed. I recall having said earlier today that what we had is two competing medical opinions, but there's more. That's what we're saying again right now. Although I find myself in the place of Irene first, and it's confusing to me. And that is because, here we are. But there is more. Whether it's over-the-top rhetoric or just being convinced of something whether you're right or wrong, Dr. Silver, upon whose opinion the commission rests its award, formulated his opinion based on there being an immediate onset of shoulder as well as elbow pain, and that the gentleman, the petitioner, Mr. Kreiger, had increasing shoulder symptoms ever since the occurrence while he was practicing, that's not the correct word, rehearsing, or he was dragging himself across the stage, that he had an elbow injury is unquestioned. But the immediate onset of shoulder pain is at best unclear. He did appear at the emergency room on the day of. What do the records of the University of Chicago Medical Center for June 27, 2011 say about the injuries? That's two days after the accident. Two days after the accident, he appeared. And as far as we're aware, the complaint was elbow injury. It says there, indicate that the claimant's arrival complaint was shoulder pain. I believe in parentheses, perhaps. There was mentions of that. So it's an inaccurate statement to say he didn't complain of shoulder pain for a long period of time, isn't it? Well, Your Honor, he did. And that's the perplexing part here. The treatment was all for the elbow. Well, but that's not the question. The question is, did he complain of shoulder pain on June 27, 2011? The records say he did. Well, the context of those records is this. He complained of pain in the elbow he described having dragged himself, from his elbow down to his hand and from his elbow up to the shoulder. Now, I don't want to get into a discussion about whether or not that represents a history of injury to the shoulder or not, but that's my understanding of what he said. And there's no question of the injury of the elbow. Nurses notes say that he presented with a left arm injury. That's right, left arm. That's true of that. Shoulder part of the arm? Oh, no, well. I mean, we have some dispute about that on this panel. Again, I don't want to use the shoulder part of the arm. That could be irrevitable. The technical situation in which it's concerned is not. I don't think you want to go around. But nonetheless, he treated Dr. Coleman thereafter and treated a therapy for the elbow and only the elbow,  the injury to the shoulder was obviously caused by dragging himself across the stage. And there could be no other conceivable cause. I mean, this is the basis for his opinion. And that's just not supported by the record. Because in lay large, the therapy records show that he felt fine after the therapy session of 826. I presume he felt fine with regard to his elbow because I don't think he was treating anybody else with the elbow. But he then said today he was complaining of the complaints of the arm from the weekend. This was the 29th of August. It was a Monday. He said he did something in his sleep but wasn't sure what. There's other history in the record. I think it's page 199 of the record where he said he only had elbow pain and was improving until the acute onset of pain after sleeping on his arm overhead and now he had increasing pain. This is also the same thing he told Dr. Cole on September 12, 2011, some six years ago, to Dick. He awoke one morning with significant pain in the upper arm, et cetera. We submit that, again, this isn't just two competing opinions. This is Dr. Silver relying on an immediate onset of shoulder pain, which increased over time. This is Dr. Silver relying on there being no other conceivable cause when he didn't have a torn rotator cuff. The doctor just repairs them free. Didn't we already cover the issue of whether or not there was an immediate onset? Didn't Justice Hoffman allude to your central argument that Dr. Silver's opinion suffered from an unsupportable assumption? He had an immediate onset of shoulder pain. Didn't we already cover that? He told the first doctor that he had shoulder pain. There is a reference in the University of Chicago records to arm pain, left arm pain. There may be even upper arm pain. Yes. Shoulder pain. Shoulder pain. So why isn't that, doesn't it run contrary to your central theme that he never talked about his shoulder? I would have to just say this, that I would take an exception to the idea that he appeared at the emergency room complaining of a shoulder injury, complaining of an elbow injury. There is a mention of the shoulder, but thereafter, there's no mention of the shoulder. So what injury was there to the shoulder? What was the diagnosis on the shoulder? I'm sorry, Your Honor, I looked at these medical records, and all I can conclude is that he was being seen for, he was being treated for an elbow injury. The idea that there was no other conceivable cause for his shoulder injury. But didn't Silver explain that? You're perplexed, I understand, logically, by why he reported this, and then there was a gap, and he didn't say anything. Didn't Silver try to explain that by saying quote, unquote, that the pain waxes and wanes? You can have it, Andrew, it can bother you for a while and then improve and worsen again. He gave an explanation for why that happened. In all fairness, Your Honor, it waxes and wanes, but he also says he had a shoulder, he injured a shoulder on the day of, and he had increasing symptoms thereafter. Dr. Silver is just all over the place. Again, I go back to no other conceivable cause. We believe that that is so flawed as to require a reversal, and I don't know that there's anything special in Dr. Silver's testimony that would cause the commission to select one doctor over another. I don't even know that that's what the petitioner argues. He basically argues that because the commission adopted Dr. Silver that, you know, it's because of that. Period. It's not the commission adopted Dr. Silver because Dr. Silver had the more compelling argument. Well, Silver also based his argument, his opinion on several other issues. Number one, he said that the mechanism of the injury, dragging himself across the stage, was consistent with his diagnosis of the shoulder problem. He testified absolutely that the activity can do tremendous damage to the rotator cuff. That was part of his opinion. And he based another portion of his opinion on the fact that the man had no prior history of shoulder problems, nothing else to explain the injury, according to him. Well, sleeping with the arm overhead at night could have, he said, no conceivable cause, although I do concede, Your Honor, that he said the mechanism, you know, the injury where he injured his elbow, I'm not going to stand before the court and say that it's impossible. Did you see the play? I'm sorry, Your Honor. Did you see the play? No, I didn't. As you reported me. So you don't think that Dr. Silver was talking about the shoulder injury when he said that the mechanism of injury was consistent with his diagnosis? You thought he was talking about the elbow? No, I'm not saying that, Your Honor. I understand what the doctor is saying when he said it. In other words, he said he did tremendous damage to the shoulder when he dragged himself across the stage when he injured the elbow, but, number one, he didn't do tremendous damage to it. The acute onset of pain came in late August, two months later, after he was sleeping on his arm. That's where we stand. All right, thank you. Thank you. Counsel, you may respond. Thank you, Mr. Court. Counsel, Joshua Verdal on behalf of the appellee, Todd Cryer. This does come down to two competing medical opinions, and it's subject to manifest weight of the evidence standard, despite the second point in counsel's brief that says that the matter of law, simply by saying the matter of law doesn't give you a de novo review, you still put conflicting medical evidence, and that's been well established by the Supreme Court and upheld in this court as well, away from Caterpillar Tractor and its product. Here we have Dr. Silver versus Dr. Sager. Dr. Silver says there's a competent mechanism, there's consistent complaints, and his exam is all consistent. Then you have Dr. Sager who says I cannot confirm a causal relationship in this case. Dr. Sager didn't review any medical records that showed there were complaints initially of shoulder pain. So he didn't say there was no causal connection, he just said I couldn't confirm. So that really wasn't contrary opinion, was it? Absolutely, and that's what I'm saying. There's an opinion of Dr. Silver that says, yes, absolutely, it's related, but he's Dr. Sager and he says I can't confirm. He was also asked to recommend a cross-examination during his deposition that if he reviewed medical records indicating initial complaints of the shoulder would that change his opinion with causation? It could, yes, was his response. He kind of whips, he doesn't say it's definitive, no. He whacks us in the wings. Absolutely, just like shoulder pain. Again, in this case, it's two different medical opinions. The commission says specifically, number one, they base this opinion on Dr. Silver's treatment records, Dr. Silver's deposition testimony, and the Petitioner's credible testimony. The Petitioner was found to be expressly credible in the decision of the commission. This is not simply Dr. Silver making this up. He reviewed all the medical records. Dr. Sager, when he says that he reviewed all the medical records but still testified, I didn't see anything from the initial complaints for shoulder, which we all know was there. Well, in any event, it's within the exclusive providence of the commission to decide the credibility of the witnesses in the weight to be given to the testimony, correct? Absolutely, and no doctor is here reading chicken entrails. If the decision is correct, it should be affirmed. Was there a back comment? Are you referring to his standard of review? Yes, sir. No doctor is reviewing chicken entrails, and this should be affirmed in its entirety. Thank you. Thank you, counsel. Counsel, you may reply. Two points, if I can remember them. One, I believe Dr. Sagerman did offer a contrary opinion. And two, the whole subject of the history of what had happened to this man didn't come into play until 2012. He was being treated for an elbow injury in 2011 after June 25. The shoulder really came into play on August 29th after he awoke with acute pain. Whether he had pain right from the beginning and it got worse, or whether he had pain in the waxen wing, this didn't become a subject of discussion until February 2012 and thereafter. I think that's something we need to consider. Thank you. Can I ask you a question? You have an issue when you breathe. The commission's permanency award is inconsistent with awards, assembly, situated petitioners. Do you think that is a permissible issue? It is not on the tort side. You cannot compare. Do you think it's comparable here? And, by the way, you say no authority for that either. I agree with you, Your Honor. Okay. Thank you. Thank you, counsel. This matter will be taken under advisement for written disposition without issue.